UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

                                  Case No. 17-cr-20733
v.                                Hon. Matthew F. Leitman

RONNIE EDWARD DUKE,

     Defendant.

_____/

## ORDER (1) DENYING DEFENDANT'S MOTION TO VACATE SENTENCE (ECF No. 170) AND (2) DENYING DEFENDANT A CERTIFICATE OF APPEALABILITY

2021 was a tough year for Defendant Ronnie Duke.  He was serving time in custody on three separate sentences that had been imposed upon him in three different federal criminal cases: a 156-month sentence for mortgage fraud, an 18-month sentence for failure to report to custody and escape, and a 96-month sentence for assaulting an Assistant United States Attorney.  And he was staring down the barrel of the 14-count First Superseding Indictment in this case, which charged him with committing wire fraud (while on pretrial release in one of his other criminal cases) and aggravated identity theft.  If convicted on those charges, he faced a sentencing guidelines range that called for well over 100 months in custody, the possibility (if not likelihood) that all five of the aggravated identity theft sentences (of two years each) would run consecutively to one another and to all of his other

1

sentences, and the requirement that at least some portion of his wire fraud sentences would run consecutively to his mortgage fraud sentence. Thus, Duke faced a substantial risk that, if convicted in this case, much, if not all, of his entire lengthy sentence would be ordered to run consecutively to all of his other sentences. The peril to Duke was clear.

But Duke was lucky in at least one sense. The Court appointed not one, but two, of the most experienced and most effective criminal defense lawyers in this district to represent him in this case. Those lawyers, Richard Korn and Craig Daly, zealously defended Duke. They filed numerous pretrial motions on his behalf, engaged consultants to manage and organize the voluminous discovery, and worked with financial experts to review issues related to the loss amount for purposes of the sentencing guidelines. They also worked hard to explore a possible plea bargain. Their goal in that endeavor, unsurprisingly, was to minimize the portion of Duke's sentence in this case that would run consecutively to his three other sentences. They achieved that goal. They persuaded the Government to agree to a carefully-crafted resolution that set Duke's total sentence at 162 months but provided that only 72 months of that sentence would run consecutively to Duke's other sentences. The Court then sentenced Duke consistent with that agreement. Given the overwhelming evidence of Duke's guilt, that result, by any measure, was a tremendous success.

Duke recognized as much.  At sentencing, he praised Korn and Daly as "hav[ing] done a great job." (Sent. Tr., ECF No. 142, PageID.1079.)

Duke now has a much different opinion of the legal work performed by Korn and Daly.  He has filed a motion under 28 U.S.C. § 2255 to vacate his convictions and sentence on the ground that their representation of him was so deficient as to constitute ineffective assistance of counsel (the "Motion"). (*See* Mot., ECF No. 170.) Duke's claims in the Motion all lack merit.  Indeed, they are so insubstantial that they do not warrant either an evidentiary hearing or a Certificate of Appealability. Accordingly, the Court **DENIES** the Motion and **DENIES** Duke a Certificate of Appealability.

## I

## A

The background of Duke's prior convictions and the procedural history of this case are set forth in some detail in the Government's response to the Motion. (*See* Resp., ECF No. 182.)  The Court finds the Government's recitations of the facts and background to be accurate and adopts it here.  The Court highlights only a few of those facts in order to provide a broader context for Duke's claims.  The Court will also set forth a handful of additional facts in its analysis of each of Duke's claims below.

**B**

Duke was charged in a First Superseding Indictment with nine counts of wire fraud (in violation of 18 U.S.C. § 3143) and five counts of aggravated identity theft (in violation of 18 U.S.C. § 1028A(a)(1)). (*See* First Superseding Indictment, ECF No. 32.)  The First Superseding Indictment alleged that Duke had committed the wire fraud while on pretrial release in his (above-mentioned) mortgage fraud case and that, accordingly, pursuant to 18 U.S.C. § 3147, at least some portion of any wire fraud sentence had to run consecutively to the sentence imposed on Duke in the mortgage fraud case.  Moreover, under 18 U.S.C. § 1028A(a)(1), each aggravated identity theft charge carried a mandatory two-year sentence that had to run consecutively to all of Duke's other sentences.  In addition, the Court retained the discretion, after considering the factors enumerated in Section 5G1.2 of the United States Sentencing Guidelines, to run all five of the aggravated identity theft sentences consecutively to one another. *See United States v. Potts*, 947 F.3d 357, 364–67 (6th Cir. 2020).

**C**

The Court appointed Korn to represent Duke shortly after Duke was indicted. (*See* Dkt., 1/9/2018.)  The Court later granted Duke's request for the appointment of a second attorney, and it added Daly to Duke's defense team. (*See* Order, ECF No. 55.)

4

On "multiple occasions," Duke discussed with Korn his (Duke's) belief that the First Superseding Indictment was flawed because two of the aggravated identity theft charges "were both for the same person." (Korn Aff., ECF No. 182-3, PageID.1915-1916.)   "[E]ach time," Korn told Duke "the same" thing: "that for strategic reasons, it was best not to file a motion to strike the redundant count prior to trial but to wait until the trial commenced and then drive home this issue during the cross examination of the Government's witnesses." (*Id.*)   Korn further explained that "if the issue was addressed in a pretrial motion, the Government could [have then] easily 'correct[ed]' the mistake by filing a super[s]eding indictment with another count of Aggravated Identity Theft referencing a different investor's name and circumstances. There were a multitude of 'victims' involved in this fraudulent scheme, and had the Government wanted to, it could have charged a lot more than five counts of Aggravated Identity Theft." (*Id.*)

Notably, before Duke entered his plea, he orally "concurred with [Korn's] strategic analysis." (*Id.*)   And he later confirmed his agreement with Korn's analysis in writing. (*See* Duke Email, ECF 182-3, PageID.1932.)

In addition to discussing Duke's concerns about the First Superseding Indictment with Duke, Korn and Daly filed several substantial pretrial motions on his behalf (*see* Mots., ECF Nos. 107-114), and they worked extensively with a court-appointed discovery coordinator.

5

**D**

At the same time that they were preparing to take the case to trial, Korn and Daly were actively exploring a possible plea deal with the Government. They were ultimately able to reach a plea deal for Duke. The agreement called for Duke to plead guilty to only two of the fourteen charges in the First Superseding Indictment: the mortgage fraud charge in Count 1 and the aggravated identity theft charge in Count 10. (*See* Rule 11 Plea Agmt., ECF No. 121.)

The parties entered into that agreement pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure – a rule that allows the parties to agree upon a particular sentence as a condition of the plea. The sentence-agreement provision of the plea agreement was carefully crafted to limit the portion of Duke's sentence that would run consecutively to the sentences Duke was already serving. That provision stated as follows:

> Under Federal Rule of Criminal Procedure 11(c)(1)(C), after considering the sentencing factors in 18 U.S.C. § 3553(a) and other applicable sentencing law, including 18 U.S.C. § 1028A(b) and USSG §§ 5G1.2 and 5G1.3, the parties agree that the appropriate disposition of this case is for Defendant to receive the following specific sentences: Defendant should receive sentences of a total of 162 months (equal to 13 years and 6 months) of imprisonment, with a total of 72 months (equal to 6 years) of imprisonment imposed to run consecutive to, and served after the completion of, the sentences of imprisonment previously imposed on Defendant in his three prior federal criminal cases in this District (case numbers 2:11-CR-20017, 2:13-cr-20881, and 2:14-cr-20136 (together, the

6

"Three Prior Federal Cases")), and with a total of 90 months (equal to 7 years and 6 months) to run concurrent to the sentences of imprisonment previously imposed on Defendant in the Three Prior Federal Cases. The parties further agree the Court should impose a total of 138 months of imprisonment as the sentence for Count 1, to be apportioned as follows: 90 months of imprisonment for the wire fraud conviction, in violation of 18 U.S.C. § 1343, to run concurrent to Defendant's undischarged prior sentences imposed in the Three Prior Federal Cases; and 48 months of imprisonment for committing that offense while on pretrial release, in violation of 18 U.S.C. § 3147, to run consecutive to Defendant's prior sentences imposed in the Three Prior Federal Cases and consecutive to all other sentences imposed in this case. The parties further agree that, for the aggravated identity theft conviction in Count 10, in violation of 18 U.S.C. § 1028A(a)(1), the Court should impose a sentence of 24 months of imprisonment, to run consecutive to Defendant's prior sentences imposed in the Three Prior Federal Cases and consecutive to all other sentences imposed in this case.

(*Id.*, PageID.570-571.)

Other provisions of the plea agreement (1) required the Government to move to dismiss all of the twelve remaining charges upon the Court's imposition of sentence and (2) prohibited the Government from bringing any other charges against Duke for crimes "known to the [Government] on the date of the execution of the agreement as it relates to this investigation." (*Id.*, PageID.549.)  Finally, another section of the plea agreement provided that Duke retained the right to object if the Government argued at sentencing that the actual or intended loss amount (of Duke's

wire fraud) warranted the assessment of more than a 14-level increase from the base offense level. (*See id.*, PageID.567-568.)

When Duke appeared before the Court to enter his plea, the Court addressed with Duke whether he was satisfied with the way in which Korn and Daly had represented him.  Duke initially said that he was satisfied, but he then appeared to equivocate just a bit.  At that point, the Court explored the matter further with Duke and confirmed that he was fully satisfied with the legal work performed by Korn and Daly.  The Court's exchange with Duke was as follows:

> Q. Are you fully satisfied with the counsel, representation, and advice given to you in this case by your attorneys?
>
> A. I believe so, your Honor.
>
> Q. Have they answered all of your questions?
>
> A. Um, I – I believe so.
>
> Q. Have they spent enough time discussing all aspects of this case with you?
>
> A. They did.
>
> Q. Have they done the tasks that you asked them to do?
>
> A. For the most part.
>
> Q. And as to those they didn't do, did they explain to you why to your satisfaction?
>
> A. Um, I – I guess I have no response to that, your Honor.

> Q. Well, Mr. Duke, one of the things that I need to be sure of when I accept a guilty plea is that the defendant is fully satisfied with the manner in which his defense lawyers have represented him. And so let me ask you the direct question, are you fully satisfied with the manner in which Mr. Korn and Mr. Daly have represented you?
>
> A. Yes, your honor.

(Plea Tr., ECF No. 141, PageID.1040-1041.)  The Court then completed the plea colloquy and accepted Duke's guilty pleas.

E

Prior to sentencing, a probation officer prepared a presentence investigation report ("PSR") for the Court and included a proposed sentencing guidelines calculation in that report. (*See* Draft PSR, ECF No. 127, PageID.604-611.)  The officer proposed increasing Duke's base offense level by 16 levels based upon the actual or intended loss caused by his wire fraud. (*See id*., PageID.604.)  Korn and Daly filed objections to that proposed assessment. (*See* PSR Addendum, ECF No. 130, PageID.693.)  The Government responded that the evidence "easily established" that the 16-level enhancement was appropriate. (*Id.*)

In the weeks leading up to sentencing, Korn and Daly engaged a forensic accountant to conduct a careful review of the probation department's loss calculation. (*See* Korn Aff., ECF No. 182-3, PageID.1914.)  After the consultant completed that review, Korn, Duke, and the consultant reviewed the loss calculation during a 1.5-hour telephone conference.  "During that call[, Duke] agreed with

9

[Korn] that there was no reason to challenge the loss amount at sentencing because of the risks involved and because the determination of the court as to [the] loss amount would have no effect on the [agreed-upon] sentence [to be] imposed." (*Id*.)

Also before sentencing, Korn and Daly submitted a substantial sentencing memorandum on Duke's behalf. (*See* Sent. Memo., ECF No. 134.)  The memorandum included numerous attachments outlining courses that Duke had completed in custody since he had started serving his other sentences. (*See* ECF No. 134-3.)  Korn and Daly also submitted medical information concerning Duke. (*See* Medical Records, ECF No. 135-2.)

Shortly before sentencing, Duke sent the Court two letters in which he raised concerns about, among other things, his lack of access to discovery materials while in the custody of the Bureau of Prisons (the "BOP") in the three years preceding his sentencing. (*See* Letters, ECF Nos.131, 132.)  In those letters, Duke contended that officials with the BOP had interfered with his ability to fully and fairly review those materials. (*See id*.)

## F

The parties appeared before the Court for sentencing on June 27, 2022.  The Court began the proceedings by addressing Duke's letters. (*See* Sent. Tr., ECF No. 142, PageID.1069-1070.)  The Court noted that Duke had raised concerns in the letters about insufficient access to discovery materials, but the Court expressed its

10

understanding that Duke was not raising those concerns so as to suggest that there was any infirmity in his plea. (*See id*.)  The Court said that it understood that Duke was raising the lack-of-access-to-discovery issue solely in order to provide context to his request that the Court make a recommendation as to the BOP facility in which Duke would be housed. (*See id*.)  Duke confirmed that the Court's understanding was "100 percent correct." (*Id*., PageID.1070.)

Next, Korn announced (after consulting with Duke) that Duke wished to withdraw his objections to the 16-level enhancement arising from the actual or intended loss amount. (*See id.*, PageID.1071-1072; Korn Aff, ECF No. 182-3, PageID.1914-1915.)  After Korn withdrew those objections, he urged the Court to follow the sentencing agreement in the Rule 11 plea agreement. (*See* Sent. Tr., ECF No. 142, PageID.1075.)  Korn highlighted that Duke had recently been diagnosed with bipolar disorder and that he had taken substantial strides to rehabilitate himself since he began serving his other sentences. (*See id*., PageID.1074-1075.)

The Government also asked the Court to follow the sentencing agreement in the plea agreement. (*See id*., PageID.1084.)   Counsel for the Government emphasized that the agreed-upon sentence – which, given its breakdown, resulted in Duke serving 72 months in custody beyond his other sentences – was warranted based upon a number of "aggravating factors." (*Id*., PageID.1082.)  Those factors included that Duke committed his crimes after he had absconded while on bond in

his mortgage fraud case, that he was "a very intelligent man" who had put his talents "to the wrong uses for so many years," and that the victims of his scheme "were left with significant debts" and some were even forced to "spend[] years trying to clean up their mess." (*Id.*, PageID.1083-1084.)

Duke also addressed the Court at sentencing.  He first stressed that he was working hard to rehabilitate himself. (*See id.*, PageID.1078.)  He then highlighted his agreement with the terms of his plea deal.  He said that he did not "want to change anything in the Rule 11 Agreement." (*Id.*, PageID.1079.)  Next, he acknowledged the high-quality work done by his attorneys.  He said that "Mr. Korn and Mr. Daly have done a great job." (*Id.*)

The Court then sentenced Duke.  The Court's sentence was fully consistent with the sentencing agreement included in the Rule 11 plea agreement and the sentence that both Duke and the Government had asked the Court to impose during the sentencing hearing.  The Court further ordered Duke to pay restitution to his victims in an amount that would be determined at a later date. (*See id.*, PageID.1089-1090.)

As the sentencing hearing was concluding, the Court asked Duke whether he had "any questions or concerns about anything that happened here this afternoon." (*Id.*, PageID.1094.)   Duke said that he was to "address one thing." (*Id.*,

PageID.1095.)  He wanted to express that he "concur[red] with everything" that counsel for the Government had said during the proceedings. (*Id.*)

## G

At some point after the sentencing, Duke began to view the proceedings differently.  In contrast to his feelings at sentencing – where he did not want to change a single thing in his plea agreement and where he said that Korn and Daly had done a great job on his behalf – he came to the conclusions that Korn and Daly had provided ineffective assistance of counsel and that he had been the victim of outrageous prosecutorial misconduct.  He presented these positions (and one other) in the now-pending Motion. (*See* Mot., ECF No. 170.)

In the Motion, Duke contends that the Court should vacate his convictions and sentence because Korn and Daly provided ineffective assistance of counsel in the following respects:

1. Korn and Daly failed to object that the First Superseding Indictment was multiplicitous in that it charged two counts of aggravated identity theft based upon conduct directed toward the same victim.  According to Duke, if Korn and Daly had properly challenged the First Superseding Indictment on this ground, then there would have been "four counts" of aggravated identity theft rather than "five counts." (*Id.*, PageID.1467.) The Court will refer to this claim of ineffective assistance of counsel as the "Multiplicity IAC Claim."

2. Korn and Daly failed to object that the Government had elicited "perjured testimony" from the lead case agent before the grand jury. (*Id.*, PageID.1470.)  Duke says that if this objection had been raised, there would have been four counts of aggravated identity theft rather than five.

The Court will refer to this claim of ineffective assistance of counsel as the "Perjured Testimony IAC Claim."

3. Korn and Daly "were both ineffective during the preparation of Duke's defense sentencing memorandum" when they failed to raise the multiplicity challenge to the First Superseding Indictment and failed to challenge the 16-level loss amount enhancement. (*Id.*, PageID.1471.) The Court will refer to this claim of ineffective assistance of counsel as the "Sentencing Memo. IAC Claim."

4. Korn and Daly were ineffective because they "did not address Duke's many major concerns of discovery documents known [sic] that had prejudiced Duke." (*Id.*, PageID.1472.) The Court will refer to this claim of ineffective assistance of counsel as the "Discovery IAC Claim."

5. Korn was ineffective when he "blocked Duke's jail calls and refused to speak to [Duke] after sentencing July 7, 2022." (*Id.*, PageID.1473.) The Court will refer to this claim of ineffective assistance of counsel as the "Post-Sentence Call Block IAC Claim."

6. Korn and Daly were ineffective for failing to challenge the "erroneous Restitution order [that] was imposed." (*Id.*, PageID.1474.) The Court will refer to this claim of ineffective assistance of counsel as the "Restitution IAC Claim."

In addition to the claims of ineffective assistance of counsel, Duke contends that his aggravated identity theft conviction cannot stand in light of the Supreme Court's decision in *Dubin v. United States*, 599 U.S. 110 (2023). (*Id.*, PageID.1475.) The Court will refer to this claim as the "*Dubin* Claim."[1]

---

[1] In the Motion, Duke references *Dubin* under an ineffective assistance of counsel heading, but in his supporting memorandum, he does not present the *Dubin* issue as one concerning the alleged ineffective assistance of counsel. (*See* Memo. of Law, ECF No. 177, PageID.1731-1732.) Instead, Duke simply argues that his conviction cannot stand in light of *Dubin*. (*See id.*) The Court addresses the *Dubin* Claim as presented in the memorandum of law because it is addressed in more detail there.

Finally, Duke claims that the Assistant United States Attorney (the "AUSA") who presented his case to the grand jury committed prosecutorial misconduct. (*See id.*, PageID.1476.)  More specifically, he claims that the AUSA "solicited" grand jury testimony that "was both misleading and perjuried [sic]." (*Id.*)  Duke says that this alleged misconduct warrants relief because "truthful" testimony "would have led to a different outcome of the Grand Jury's proceedings and prejudiced Duke and effected [sic] the outcome of the case." (*Id.*)  The Court will refer to this claim as the "Prosecutorial Misconduct Claim."

Duke asks the Court to "[v]acate [his] conviction[s] and sentence, and [to grant] any other relief th[e] [C]ourt feels is appropriate." (*Id.*, PageID.1480.)  Duke also contends that he is entitled to an evidentiary hearing on his claims. (*See* Memo. of Law, ECF No. 177, PageID.1713.)  Duke did not support his Motion with his own affidavit or any other affidavit.

The Government filed a response in opposition to the Motion. (*See* Resp., ECF No. 182.)  The Government supported its response with affidavits from Daly and Korn. (*See* Daly Aff., ECF No. 182-1; Korn Aff., ECF No. 182-3.)

The Court has carefully reviewed all of the parties' filings, and it is now prepared to rule on Duke's motion.

## II

The Court begins with Duke's ineffective assistance of counsel claims.  For the reasons explained below, he is not entitled to relief on any of those claims.

## A

In these Section 2255 proceedings, the Court must evaluate Duke's ineffective assistance of counsel claims under the following standard:

> Section 2255 requires [a district court] to afford relief if a prisoner's constitutional rights were infringed. 28 U.S.C. § 2255. Ineffective assistance of counsel claims are cognizable under § 2255. *Massaro v. United States*, 538 U.S. 500, 504, 508–09, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003). "[T]he Sixth Amendment's requirement that defendants receive 'the effective assistance of competent counsel' extends to all critical stages of a criminal proceeding," including plea negotiations, *Byrd v. Skipper*, 940 F.3d 248, 255 (6th Cir. 2019) (first quoting *Lafler v. Cooper*, 566 U.S. 156, 163, 132 S.Ct. 1376, 182 L.Ed.2d 398 (2012); and then citing *Padilla v. Kentucky*, 559 U.S. 356, 373, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010)), sentencing, and direct appeal, *Lafler*, 566 U.S. at 165, 132 S.Ct. 1376.

> To prove that he was deprived of that right, Gilbert must show deficient performance by counsel and resulting prejudice to the defendant. *Strickland*, 466 U.S. at 687, 694, 104 S.Ct. 2052. To establish deficient performance, a petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690, 104 S.Ct. 2052. To prove prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a

probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

Although defendants have no constitutional right to a plea offer, "when the Government chooses to enter into plea negotiations, the Constitution requires that defendants receive effective assistance in navigating that crucial process." *Rodriguez-Penton*, 905 F.3d at 489 (citing *Lafler*, 566 U.S. at 168, 132 S.Ct. 1376). That means accurate advice regarding sentence exposure. *Smith v. United States*, 348 F.3d 545, 553 (6th Cir. 2003) (holding that a defendant has the right to have his counsel "explain the sentencing exposure the defendant will face"); *Moss v. United States*, 323 F.3d 445, 474 (6th Cir. 2003). *See generally Byrd*, 940 F.3d at 257–58 (noting that an attorney has a duty to give correct legal advice (collecting cases)).

Generally speaking, "prejudice may lie where a petitioner demonstrates that counsel's deficient performance infected his decisionmaking process, and thus undermine[d] confidence in the outcome of the plea process." *Rodriguez-Penton*, 905 F.3d at 488. In the plea negotiation context, that means showing "a reasonable probability that, with proper advice, the outcome of those negotiations would have been different." *Id.* at 489–90; *Byrd*, 940 F.3d at 258 (same). A defendant is not limited to showing he would have gone to trial but for the bad advice during the plea process. *Rodriguez-Penton*, 905 F.3d at 487–88. He "may demonstrate prejudice if he can show that, had he known about the risk of adverse ... consequences, he would have bargained for a more favorable plea." *Id.* at 488.

*Gilbert v. United States*, 64 F.4th 763, 770–71 (6th Cir. 2023)

**B**

As an initial matter, all of Duke's ineffective assistance of counsel claims fail because he has not sufficiently alleged that any of the purportedly-deficient actions by his attorneys caused him prejudice. More specifically, he has not shown "a reasonable probability" that absent the claimed errors by his attorneys, "the outcome of [the] negotiations would have been different." *Id.* at 771. Indeed, Duke has not made *any* factual allegations about the course of the plea negotiations, the terms of any plea offers or counter-offers, or the factors that he considered in evaluating plea offers and making counter-offers. Instead, Duke simply identifies the ways in which his attorneys purportedly erred and then baldly asserts that if they had not erred in those ways, "there would have been a different result and outcome." (Reply, ECF No. 183, PageID.1944.) Duke's naked assertion that the result of the plea negotiations would have been "different" absent his attorneys' alleged errors is not a plausible allegation of prejudice; it is a mere parroting of the legal test for prejudice.

In his Reply, Duke says that the result of the plea negotiations would have been different if his attorneys had raised a multiplicity challenge to the aggravated identity theft charges in the First Superseding Indictment and reduced the number of those charges down from five to four. (*See id.*, PageID.1944.) But Duke pleaded guilty to only a single charge of aggravated identity theft, and he offers no

explanation as to how the outcome of his plea negotiations would have been different if he had been facing four (rather than five) aggravated identity theft charges.

Duke further contends in his Reply that the result of the plea negotiations would have been different if his attorneys had properly investigated the loss amount for his offenses before the negotiations began. (*See id*., PageID.1948.)  But Duke does not allege or present any evidence that the plea negotiations turned in any way on the loss amount for his crimes.  And the evidence in the record shows that they did not.  As Daly attested in his sworn affidavit, the "main concern and focus [in connection with the plea negotiations] was to reach an agreement with the government regarding [the portion of] the sentence that would run consecutive to [Duke's] prior sentences." (Daly Aff., ECF No. 182-1, PageID.1910.)   Duke has not disputed that contention,[2] nor has he explained how any loss amount calculations would have impacted the negotiations concerning the amount of the total sentence *that would be served consecutively to his other sentences*.

---

[2] Duke attacks Daly's affidavit as "vague" and says – incorrectly – that the affidavit shows that his attorneys wanted to reach a deal as quickly as possible. (Reply, ECF No. 183, PageID.1944.)  But Duke never disputes Daly's claim that the goal of the negotiations was to limit the portion of Duke's sentence to be served consecutively to his other sentences.

## C

Duke has also failed to satisfy the deficient performance prong with respect to any of his ineffective assistance of counsel claims.  The Court addresses each of the claims individually below.

*The Multiplicity IAC Claim.*  As noted above, in this claim, Duke alleges that his attorneys unreasonably failed to raise a multiplicity objection to the First Superseding Indictment.  "An indictment is multiplicitous if it charges a single offense in more than one count." *United States v. Schaffner*, 715 F.2d 1099, 1102 (6th Cir. 1983) (citing *United States v. Robinson*, 651 F.2d 1188, 1194 (6th Cir. 1981)).  Duke contends that the First Superseding Indictment was multiplicitous because two of the aggravated identity theft charges (under 18 U.S.C. § 1028A) involved the same victim. (*See* Memo. of Law, ECF No. 177, PageID.1713-1719.) And he faults his attorneys for not raising that issue.

Duke has failed to show deficient performance for two reasons.  To begin, the First Superseding Indictment was not multiplicitous, and thus any multiplicity objection would have been futile.  While two of the aggravated identity theft charges did involve the same victim (Counts 10 and 12), the charges related to two different uses of that victim's identity, and those separate uses are properly charged as separate crimes.  As the Government correctly explained:

Multiple instances of possession or use of another person's means of identification are properly charged in multiple counts, even for the same person—and even, unlike here, for the same means of identification. *See, e.g.*, *See* [sic] *United States v. Taylor*, No. CR 19-303 (RBW), 2023 WL 5417247, at *11 (W.D. Pa. Aug. 22, 2023) ("The Court agrees with the courts in both *Abdi* and *Hinojosa* that § 1028A authorizes the separate charging of each individual 'transfer[ ], possess[ion], or use[ ]' of 'a means of identification of another person[.]'"). The same *means of identification* for the same person could be "used" multiple times in relation to the same conspiracy (or scheme) offense over time, and that could be separately charged, or the same identity could be used in relation to separate underlying offenses. *E.g.* *United States v. Soto*, 799 F.3d 68, 87 (1st Cir. 2015) ("The same is true regarding each count of aggravated identity theft. Though Steven was charged with multiple counts of unlawfully using Bradley's and Espinal's identity, each count was tied to a different and distinct underlying felony—the fraud related to the motorcycles and automobiles in the prior case and the mail fraud related to each property in the present case."); *United States v. Hinojosa*, No. 14-cr-38, 2015 WL 999893, at *9 (N.D. Ga. Mar. 6, 2015) (two uses of the same stolen social security number supported two counts of violating § 1028A); *United States v. Abdi*, No. 13-cr-484, 2014 WL 3828165, at *11 (N.D. Ga. Aug. 4, 2014) (aggravated identity theft charges not multiplicitous where each count charged separate use of the same stolen identity).

Here, Defendant had created two different means of identification for Victim 1 (two Fraudulent Cards with different account numbers), and each means of identification was used on different occasions, each in relation to a different underlying offense (two different executions of the fraud scheme, charged as separate wire fraud counts, for events in which Defendant fraudulently used each card on video surveillance). That two different versions of Victim 1's name were used on the two

> Fraudulent Cards was the product of Defendant's choice
> when he created those cards. There was nothing improper
> about including two counts for those two events.

(Resp., ECF No. 182, PageID.1896-1897.)  Because a multiplicity objection would

have been futile, Duke's lawyers were not ineffective in withholding such an

objection. *See Harris v. United States*, 204 F.3d 681, 683 (6th Cir. 2000) (holding

that failure to make a futile objection did not constitute ineffective assistance of

counsel).

Second (and in any event), Duke's lawyers made a reasonable strategic

decision to withhold a multiplicity objection.  As Korn has attested, "for strategic

reasons," he decided that "it was best not to file a motion to strike the [allegedly]

redundant [aggravated identity theft] count prior to trial but to wait until the trial

commenced." (Korn Aff., ECF No. 182-3, PageID.1916.)  Korn said that he "felt

that if the issue was addressed in a pretrial motion, the Government could easily

'correct' the mistake by filing a super[s]eding indictment with another count of

Aggravated Identity Theft referencing a different investor's name and

circumstances. There were a multitude of 'victims' involved in this fraudulent

scheme, and had the Government wanted to, it could have charged a lot more than

five counts of Aggravated Identity Theft." (*Id.*)  Because Korn had reasonable

strategic reasons for withholding a multiplicity challenge, his failure to raise such a

challenge was not deficient performance. *See, e.g.*, *Wright v. Bell*, 619 F.3d 586, 597

(6th Cir. 2010) ("Reasonable strategic decisions made after thorough investigation do not amount to ineffective assistance of counsel.").

   *The Perjured Testimony IAC Claim.*  As noted above, in this claim, Duke says that his lawyers unreasonably failed to challenge allegedly false testimony before the grand jury.  According to Duke, the testimony falsely suggested that the victims of aggravated identity theft in Counts 10 and 12 were different people.  Duke says that if his attorneys had raised this challenge, he would have faced four, rather than five, counts of aggravated identity theft.

   Duke has not shown that his attorneys performed deficiently with respect to the alleged perjury.  As Korn attested in his affidavit (quoted above), he had strategic reasons not to raise before trial any challenge relating in any way to the identity of the victim in Counts 10 and 12. (*See* Korn Aff., ECF No. 182-3, PageID.1916.) Those reasons included not giving the Government an opportunity to add new aggravated identity theft charges related to other victims of Duke's scheme. (*See id.*) Korn also had a reasonable strategic plan for dealing with any irregularities in the manner in which the Government presented Counts 10 and 12 to the grand jury.  He planned to "confront the Government's witnesses at trial" in order to "make the prosecution look incompetent in the eyes of the jury and call into question the credibility of the Government's case." (*Id.*)  Korn's reasonable strategic choices

23

preclude Duke's claim that his lawyers performed deficiently by not raising the alleged perjury in a pre-trial motion. *See Wright*, 619 F.3d at 597.

*The Sentencing Memo. IAC Claim.*  As noted above, in this claim Duke alleges that his attorneys were ineffective when they failed to raise the multiplicity challenge and a challenge to the loss amount in their sentencing memorandum.  The withholding of the multiplicity challenge was not deficient performance because, as explained above, that challenge was futile.  And Korn has attested that he made a strategic decision to withhold an objection to the loss amount because (1) since Duke had a plea agreement that specified a particular sentence, the loss amount "would have no effect on the sentence imposed" and (2) challenging the amount could undermine Duke's claim that he had fully accepted responsibility. (Korn Aff., ECF No. 182-3, PageID.1914-1915.)  That strategic decision was reasonable, and it precludes any claim that the withholding of a challenge to the loss amount was deficient performance.[3]

*The Discovery IAC Claim.*  As noted above, in this claim Duke contends that Korn and Daly were ineffective because they did not address concerns that Duke had raised regarding his lack of access to discovery.   This claim is barred by Duke's sworn statements at the plea hearing.  As quoted above, during that hearing, Duke

---

[3] Korn and Daly initially did object to the loss amount when they reviewed the draft PSR, but for the same reasons set forth above (and after consulting with Duke), they withdrew that objection. (*See* Korn Aff., ECF No. 182-3, PageID.1914-1915.)

24

confirmed that he was "fully satisfied with the manner in which Mr. Korn and Mr. Daly [had] represented [him]." (Plea Tr., ECF No. 141, PageID.1040-1041.) Duke is bound by that sworn testimony. *See Baker v. United States*, 781 F.2d 85, 90 (6th Cir. 1986); *McAdoo v. Elo*, 365 F.3d 487, 496 (6th Cir. 2004). And in light of his assurance to the Court that he was fully satisfied with the manner in which his counsel had handled his case, he may not now be heard to complain that his attorneys unreasonably failed to address his concerns related to discovery access. In any event, as noted above, he has not even alleged that the results of the plea negotiations and/or his decision to plead guilty under the terms of the plea agreement would have been different if his concerns about access to the discovery materials had been addressed to his satisfaction.

Duke's statements at the sentencing hearing further confirm that he has no grounds to seek relief on the basis that his attorneys did not address his concerns related to access to discovery materials. As noted above, just prior to sentencing, Duke raised discovery-access issues with the Court. Then, at sentencing, he confirmed that those issues related *not* to dissatisfaction with his plea, but, instead, to his request to be designated to a particular BOP institution. Also at sentencing, he said that Korn and Daly did a "great job." (Sent. Tr., ECF No. 142, PageID.1079.) These statements underscore that Duke is not entitled to relief based upon the alleged failure to Korn and Daly to secure for him access to discovery materials.

*The Post-Sentence Call Block IAC Claim*.  As noted above, in this claim, Duke alleges that Korn performed unreasonably when Korn blocked his (Duke's) calls from prison after sentencing.  This claim fails because, among other reasons, Korn did not block Duke's calls. (*See* Korn Aff., ECF No. 182-3, PageID.1917.)  As Korn explains, he retired and closed his office after the sentencing. (*See id*.)  That explains Duke's inability to reach him by phone.[4]

*The Restitution IAC Claim.*  As noted above, in this claim, Duke contends that his lawyers performed deficiently in failing to challenge the restitution order that was entered after sentencing.  Duke is not entitled to relief on this claim.  As an initial matter, there appears to be some question as to whether a challenge to a restitution order is cognizable in a motion under Section 2255.  Duke has not cited any cases addressing that issue.  And some courts have held that a defendant may not seek relief from a restitution order in a motion under Section 2255. *See, e.g.*, *United States v. Mayhew*, 995 F.3d 171, 183 (4th Cir. 2021) (holding that an in-custody defendant who brought a motion under Section 2255 challenging his custodial sentence could not also seek relief from a restitution order in that motion and "join[ing] the virtual consensus in the federal circuits … that by its plain terms

---

[4] Duke says that he communicated with Korn by mail after Korn closed his office, but that fact does not in any way support Duke's contention that Korn blocked his phone calls.

§ 2255 provides no avenue to challenge a restitution order"). It does not appear that the Sixth Circuit has squarely decided the issue.

In any event, the undisputed evidence shows that Duke communicated to his lawyers that he did not want to challenge the Government's restitution figures, and thus Duke has no basis to claim that they were ineffective for failing to do so. Daly attests under oath in his affidavit that Duke *agreed* to the Government's restitution numbers and said that he did *not* want to return to court for a restitution hearing. (*See* Daly Aff., ECF No. 182-1, PageID.1911.) Duke does not dispute Daly's sworn statement. He says only that Daly "knew" the restitution figures were inaccurate. (*See* Reply, ECF No. 183, PageID.1947.) But given Duke's stated agreement with the figures and disinterest in challenging them, Daly did not act unreasonably in withholding a challenge to the restitution order.

## D

For all of these reasons, Duke is not entitled to relief on any of his ineffective assistance of counsel claims.

## III

The Court turns next to the *Dubin* Claim. As explained above, in this claim, Duke seems to suggest that his conviction for aggravated identity theft cannot stand in light of the Supreme Court's decision in *Dubin v. United States*, 599 U.S. 110

(2023), a decision that was issued after the Court sentenced Duke in this case.  This claim fails as a matter of law.

First, Duke waived this claim in his Rule 11 plea agreement.  In that agreement, he waived the right to assert any and all claims on collateral review – including by a motion under Section 2255 – other than claims for ineffective assistance of counsel and prosecutorial misconduct. (*See* Plea Agmt., ECF No. 121, PageID.577.)  The *Dubin* Claim is plainly covered by that waiver.

Second, *Dubin* does not undermine Duke's conviction for aggravated identity theft in any way.   In *Dubin,* the Supreme Court held that a defendant commits aggravated identity theft when his use of another means of identification lies "at the crux of the underlying criminality." *Dubin*, 599 U.S. at 122.  Duke admitted using a means of identification in just that way in his plea agreement. (*See* Plea Agmt., ECF No. 121, PageID.551-563.)  Thus, Duke would not be entitled to relief under *Dubin* even if he retained the right to assert the *Dubin* Claim.

## IV

The Court next turns to Duke's prosecutorial misconduct claim.  Duke's allegations of prosecutorial misconduct are somewhat difficult to follow.  They appear to fall into two primary categories.  First, he seems to suggest that AUSA who presented his case to the grand jury failed to inform the grand jurors that the victim in Counts 10 and 12 of the First Superseding Indictment (who was referred

to as G.R. in Count 10 and G.I. in Count 12) was the same person, and he says that that failure led the grand jury to improperly charge two different offenses in Counts 10 and 12.  (This claim is related to the multiplicity issue discussed above.)  Second, he appears to contend that the AUSA presented perjured testimony to the grand jury about a victim with the initials K.G.  Duke is not entitled to relief on either theory of prosecutorial misconduct.

For all of the reasons explained by the Government, the Court concludes that Duke has failed to show that the AUSA (or the lead case agent whose testimony the AUSA presented to the grand jury) knowingly and intentionally misled the grand jury in any respect. (*See* Resp., ECF No. 182, PageID.1903-1905.)  The Court is simply not persuaded that Duke has alleged actionable prosecutorial misconduct.

Likewise, for the reasons explained by the Government, the misconduct alleged by Duke, even if it had occurred, would not have been so pervasive as to have fundamentally undermined the overall fairness and integrity of the grand jury proceedings.[5] (*See id.*)  Indeed, Duke does not make any effort to show how the alleged misconduct tainted his two guilty pleas.  For instance, he does not explain how the AUSA's purported misconduct relating to two victims (G.I./G.R. and K.G.) materially tainted his guilty plea to Count One of the First Superseding Indictment

---

[5] The Court does not reach the Government's arguments that Duke waived his prosecutorial misconduct claim.  The Court adopts only the Government's arguments that address the lack of merit in the claim.

where (1) that Count alleged that he defrauded *over 70 victims* and (2) he has not sufficiently identified any prosecutorial misconduct relating to the myriad other victims.   Likewise, he does not explain how the AUSA's supposed misconduct related to G.I./G.R. and K.G. materially tainted his guilty plea to Count 10 where (as described above) (1) that Count was proper even though G.I./G.R. was the victim in both that Count and Count 12 and (2) that Count did not relate to K.G.

Duke has not sufficiently alleged or shown that any purported prosecutorial misconduct entitles him to relief from his plea-based convictions and sentence.   He is therefore not entitled to relief on his prosecutorial misconduct claim.

## V

The Court next addresses Duke's request for an evidentiary hearing.   The Court applies the following standards in determining whether to hold such a hearing:

> An evidentiary hearing "is required [under Section 2255] unless the record conclusively shows that the petitioner is entitled to no relief." *Campbell v. United States*, 686 F.3d 353, 357 (6th Cir. 2012) (quoting *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999)); *see also* 28 U.S.C. § 2255(b). The burden "for establishing an entitlement to an evidentiary hearing is relatively light," and "[w]here there is a factual dispute, the *habeas* court must hold an evidentiary hearing to determine the truth of the petitioner's claims." *Turner v. United States*, 183 F.3d 474, 477 (6th Cir. 1999). A petitioner's "mere assertion of his innocence," without more, does not entitle him to an evidentiary hearing. *Valentine v. United States*, 488 F.3d 325, 334 (6th Cir. 2007); *see also Turner*, 183 F.3d at 477. But when presented with factual allegations, "a district court may only forego a hearing where 'the petitioner's

allegations cannot be accepted as true because they are
contradicted by the record, inherently incredible, or
conclusions rather than statements of fact.'" *MacLloyd v.
United States*, 684 Fed.Appx. 555, 559 (6th Cir. 2017)
(internal quotation marks omitted) (quoting *Arredondo*,
178 F.3d at 782). "[W]hen a defendant presents an
affidavit containing a factual narrative of the events that is
neither contradicted by the record nor inherently
incredible and the government offers nothing more than
contrary representations to contradict it, the defendant is
entitled to an evidentiary hearing." *Huff*, 734 F.3d at 607
(citation and internal quotation marks omitted).

*Martin v. United States*, 889 F.3d 827, 832 (6th Cir. 2018).

Duke is not entitled to an evidentiary hearing because, for all of the reasons
explained above, all of his claims fail as a matter of law on the record before the
Court.  There are simply no "factual dispute[s]" to be resolved at such a hearing.
*Turner v. United States*, 183 F.3d 474, 477 (6th Cir. 1999).  For instance, while Duke
offers his thoughts on the affidavits of attorneys Korn and Daly, he does not identify
any *evidence* in the record that contradicts their factual assertions that are fatal to
many of his ineffective assistance of counsel claims.  Indeed, he does not even make
any specific factual allegations that contradict the key factual contentions made by
Korn and Daly.  Moreover, he has not "present[ed] an affidavit containing a factual
narrative of the events," *Huff v. United States*, 734 F.3d 600, 607 (6th Cir. 2013), and
the absence of such an affidavit underscores the lack of any factual dispute to be
resolved at an evidentiary hearing.  Finally, as noted above, some of Duke's claims
rest on contentions that are conclusory – like his naked assertion that the result of

31

the plea bargaining process would have been different if his lawyers had calculated the loss amount and eliminated one of the five aggravated identity theft charges – and such assertions are insufficient to warrant an evidentiary hearing. *See Martin*, 889 F.3d at 832.

For all of the reasons explained above, the Court concludes that Duke is not entitled to an evidentiary hearing.

## VI

Finally, Duke may not appeal the Court's decision unless the Court issues him a Certificate of Appealability. *See* 28 U.S.C. § 2253(c)(1)(B); Fed. R. App. P. 22. A court may issue a Certificate of Appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). That standard is met when "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner." *Welch v. United States*, 136 S. Ct. 1257, 1263 (2016) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Here, reasonable jurists would not debate the Court's conclusion that Duke is not entitled to the relief he seeks. Thus, the Court declines to issue Duke a Certificate of Appealability.

# VII

For all of the reasons explained above, **IT IS HEREBY ORDERED** that:

- Duke's motion to vacate his sentence (ECF No. 170) is **DENIED**; and

- Duke is **DENIED** a Certificate of Appealability.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  December 11, 2025


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on December 11, 2025, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126